UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

*In re* JEFFREY NAGLER, as owner of the Fishing
Vessel Midnight Star, O.N. 279584, and BULLET
SERVICES LLC, as owner of the Fishing Vessel
Lady Midnight, O.N. 524895, for exoneration from
or limitation of liability.

**MEMORANDUM & ORDER**
15-CV-1453 (MKB)
15-CV-1557 (MKB)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Petitioners Jeffrey Nagler, as owner of the fishing vessel Midnight Star, and Bullet

Services LLC, as owner of the fishing vessel Lady Midnight, brought the above-captioned

Petition[1] on March 19, 2015, for exoneration or limitation of liability pursuant to the Limitation

of Liability Act (the "Limitation Act"), 46 U.S.C. § 30501 *et seq*.  (Pet., Docket Entry No. 1.)

This matter arises from injuries that Respondent Michael Cerillo sustained after falling into an

uncovered hatch aboard the Midnight Star.  Prior to this action, on November 10, 2014, Cerillo

commenced an action in New York State Supreme Court, Kings County, alleging negligence by

the crew and owner of the Midnight Star.[2]  On March 25, 2015, after filing this Petition to seek

---

[1]  The Court, like the Second Circuit, "adhere[s] to the more common practice of using
the terms 'petition' and 'petitioner' under the Limitation of Liability Act rather than 'complaint'
and 'plaintiff.'"  *In re Petition of Germain*, 824 F.3d 258, 262 n.5 (2d Cir. 2016) (quoting
*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 241 n.2 (2014)).

[2]  The complaint filed in state court states that Cerillo was a passenger aboard the Lady
Midnight on the date of the incident.  (*See* Compl. ¶ 10, annexed to Notice of Removal as Ex. 1,
*Cerillo v. Nagler*, No. 15-CV-1557, Docket Entry No. 1.)  In the Notice of Removal and in a
subsequent stipulation, the parties clarified that although the Midnight Star and Lady Midnight
both embarked on a fishing voyage from the same location on the same date, Cerillo was injured
aboard the Midnight Star.  (Notice of Removal ¶ 7; Stipulation Re Identification of Proper
Fishing Vessel ("Stip. Re Vessel") at 1, No. 15-CV-1453, Docket Entry No. 19.)  As part of the
parties' stipulation, they agreed that "[a]ny reference to the 'LADY MIDNIGHT' in this matter's
personal injury complaint shall be construed to mean the 'MIDNIGHT STAR.'"  (Stip. Re
Vessel at 1.)

exoneration or limitation of liability in connection with Cerillo's injury, Petitioners removed

Cerillo's state negligence action to the Eastern District of New York, asserting that the district

court has original admiralty and maritime jurisdiction over the matter.  (*See* Notice of Removal,

*Cerillo v. Nagler*, No. 15-CV-1557, Docket Entry No. 1.)

        Petitioners now move for summary judgment on the Petition pursuant to Rule 56(a) of the

Federal Rules of Civil Procedure, arguing that "nothing in the [record] suggests that there was

any negligence on the part of the [Midnight Star] or her crew" that caused Cerillo's injury.

(Pet'rs Mot. for Summ. J. ("Pet'rs Mot."), Docket Entry No. 26; Pet'rs Mem. in Supp. of Pet'rs

Mot. ("Pet'rs Mem.") 7, Docket Entry No. 26-3.)  Cerillo cross-moves to dismiss the Petition

under Rule 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56(a) of the

Federal Rules of Civil Procedure.[3]  (Resp. Cross-Mot. and Opp'n to Pet'rs Mot. ("Resp. Cross-

---

[3]  In general, a court deciding a motion to dismiss under Rule 12(b)(6) must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice can be taken."  *Concord Assoc's, L.P. v. Entm't Props. Trust*, 817 F.3d 46, 51 n.2 (quoting *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  However, Rule 12(b)(6) permits a district court to consider matters outside of the pleadings and to treat a motion for dismissal as one for summary judgment provided "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(b)(6).  In converting a motion to dismiss, "[t]he essential inquiry is whether the [nonmoving party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."  *Sahu v. Union Carbide Corp.*, 548 F.3d 59 (2d Cir. 2008) (quoting *In re G&A Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied*, 475 U.S. 1015 (1986)).  A party cannot complain of a lack of reasonable opportunity to present all material relevant to a motion for summary judgment "when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss."  *Id.*  Here, the parties have appended to their motions over a dozen additional exhibits, including depositions and photographs that cannot reasonably considered incorporated in or integral to the Petition at issue.  Petitioners had ample notice that Cerillo's cross-motion could be treated as a motion for summary judgment because Cerillo requested it.  (*See* Resp. Cross-Mot. at 1 (requesting "an Order granting summary judgment dismissing the above-captioned matter pursuant to [Rule 56] and/or dismissing the above-captioned matter for the failure to state a claim pursuant to [Rule

Mot."), Docket Entry No. 24; Resp. Mem. in Supp. of Resp. Cross-Mot. ("Resp. Mem."), Docket

Entry No. 24-1.)  Cerillo argues that Petitioners have pleaded no set of facts in the Petition under

which they would be entitled to a limitation of liability.  (Resp. Mem. 8.)  For the reasons

discussed below, Petitioners' motion for summary judgment is denied in part and granted in part,

and Cerillo's cross-motion for summary judgment is granted.  In addition, the Court remands the

underlying personal injury action, *Cerillo v. Nagler*, No. 15-CV-1557, to New York State

Supreme Court, Kings County.

### I.  Background

The following facts are undisputed except where otherwise noted.  The Midnight Star and

the Lady Midnight are fishing vessels for hire certified by the United States Coast Guard to carry

fewer than 100 passengers at a time on the coastal waters of the United States.  (Pet'rs Statement

of Material Facts Pursuant to Local R. 56.1 ("Pet'rs 56.1") ¶¶ 2, 4, Docket Entry No. 26-2.)  The

vessels take passengers from Pier 1 in Sheepshead Bay, Brooklyn, to a fishing area located

several miles offshore.  (*Id.* ¶ 5.)  Nagler is the sole owner of the Midnight Star.  (*Id.* ¶ 1.)  Bullet

Services LLC, a New York-based company, is the owner of Lady Midnight.[4]  (*Id.* ¶ 3.)  Nagler

operates both the Midnight Star and the Lady Midnight, as well as a third fishing vessel within

the Bullet Services LLC fleet.  (Resp. Statement of Material Facts Pursuant to Local R. 56.1

("Resp. 56.1") ¶ 5, Docket Entry No. 24-2.)

---

12(b)(6)].").)  Therefore, the Court will convert Cerillo's motion to dismiss into a motion for
summary judgment.

[4]  According to Nagler's deposition, he owns and operates three vessels registered to
Bullet Services LLC:  Lady Midnight, Midnight Star and Captain Midnight.  (Dep. of Jeffrey
Nagler ("Nagler Dep.") 5:16–25, Docket Entry No. 24-7.)  Nagler is the sole shareholder of
Bullet Services LLC.  (*See id.* at 8:8–10; Resp. Counter-Statement of Material Facts Pursuant to
Local R. 56.1 ("Resp. Counter-56.1") ¶¶ 1, 3, Docket Entry No. 24-3.)

On September 15, 2014, Cerillo, a seventy-year-old resident of Staten Island, boarded the Midnight Star with his two sons and his grandson, all fare-paying passengers.  (Pet'rs 56.1 ¶ 7; Resp. 56.1 ¶¶ 1–2.)  Cerillo and his two sons were regular customers who had gone fishing with Nagler approximately twice per week during each summer season, May to October, for the previous five years.  (Pet'rs 56.1 ¶ 16; Resp. 56.1 ¶ 6.)  On September 15, 2014, the Midnight Star departed from Pier 1 at approximately 8:00 AM to fish for fluke at the "Tin Can fishing grounds."  (Pet'rs 56.1 ¶ 6.)  Nagler was the captain of the Midnight Star that day.  (Resp. 56.1 ¶ 4.)  The parties agree that, in addition to Nagler, there were two mates aboard the Midnight Star on the day of Cerillo's accident.  (*See* Dep. of Michael Steven Cerillo ("Cerillo Jr. Dep.") 19:8–20, Docket Entry No. 26-11; Dep. of Jeffrey Nagler ("Nagler Dep.") 24:10–12, 24:24–25, 66:2–8, Docket Entry No. 24-7.)  One of these mates, Kyle White, seems to have been a relative veteran with Petitioners' vessels, while the other, Curtis Pervis, was new to Petitioners' vessels.[5] (Nagler Dep. 24:10–12; 24:24–25; Cerillo Jr. Dep. 19:21–25.)

At approximately 12:30 or 1:00 PM, Cerillo attempted to use the restroom on board the vessel but found no toilet paper.  (Resp. 56.1 ¶ 7.)  He then walked into the cabin of the Midnight Star and toward the galley area to find toilet paper, aware from his prior trips on the vessel that toilet paper was stored in the galley.  (*Id*. ¶ 8.)  It was dark in the cabin of the Midnight Star and the exterior windows leading to the cabin were tinted.  (*Id*. ¶ 15.)  As he walked behind the galley counter to find the toilet paper, Cerillo fell into an opening in the floor created by an open hatch door that was approximately three feet wide by four feet long.  (*Id.* ¶ 8; Pet'rs 56.1 ¶ 10.)  Cerillo had not observed that the hatch cover was open.  (Pet'rs 56.1 ¶ 11; Resp. 56.1 ¶ 15.)  The

_____

[5]  None of the deposed witnesses could speak to either mate's training or history.  (*See* Nagler Dep. 58:2–9 (testifying that neither White nor Pervis underwent training with Nagler).)

hatch cover had been opened to allow the boat's generator to cool while it was not in use.  (Pet'rs 56.1 ¶ 15.)  According to Cerillo, the hatch cover was either opened by Nagler himself or at his express direction.  (Resp. Counter-Statement of Material Facts Pursuant to Local R. 56.1 ("Resp. Counter-56.1") ¶ 15, Docket Entry No. 24-3.)   After the incident, Cerillo's son told Nagler that his father had been injured "pretty badly" and that he would like to return to the dock to seek medical attention.[6]  (*Id.* ¶ 18.)  Nagler continued to fish and returned to the dock at the scheduled time, (*id.*), between 3:00 and 4:00 PM, (Pet'rs 56.1 ¶ 6).

As a result of the fall, Cerillo sustained several injuries.  His left femur was fractured, which required him to undergo surgery to implant a titanium rod in his left leg.  (Resp. 56.1 ¶ 17.)  Cerillo was hospitalized for fifty-four days, spent several months in a rehabilitation facility and still experiences pain from the incident.  (*Id.*)

The hatch in the galley was approximately twelve square feet in area and contained a generator that operated the toilets, lights and everything electric on the vessel.  (Nagler Dep. 41– 43.)  The hatch cover could be lifted and hinged to the side by pulling a sunken handle.  (*Id.* at 42:10–21.)  The generator hole was deep enough that a person accessing it would have to climb down a ladder, after which he or she could walk around the generator room, about fourteen feet of space, and access other parts of the vessel's engine.  (*Id.* at 45:11–46:12.)

On the morning of a sail, Nagler or whichever mate arrived at the dock first on any given day would open the hatch cover and enter the hatch to turn on the electricity and check the oil.  (*Id.* at 42:22–25, 43:13–44:10.)  According to Nagler's deposition testimony, on the day of Cerillo's accident, Nagler was the first to arrive and had opened the hatch to check the oil and

---

[6]  Although Petitioners do not dispute this in their Statement of Material Facts, Nagler testified that Cerillo's son had told him that Cerillo, Sr. was "fine," and that they did not want to return to the dock.  (Nagler Dep. 59:6–9; 61:4–12.)

the water that cooled the generator.  (*Id.* at 44:11–15.)  The hatch was opened mid-trip to cool the generator because it had been running for hours that morning.  (*Id.* at 70:5–12.)  Because the generator did not often overheat, there was not often a reason to open the hatch in the middle of the day.  (*Id.* at 71:8–16.)  Nagler did not recall whether he had opened the hatch himself that afternoon but typically, he "would notify the crew to do it."  (*Id.* at 71:2–3.)  A mate would only open the hatch at Nagler's direction.  (*Id.* at 72:3–6.)

The parties dispute the nature and use of the galley area in the cabin.  Petitioners claim that the area behind the galley counter is used by the crew only, to store fishing rods, sinkers, tackle, coffee, soft drinks, and other items that fare-paying passengers may purchase.  (Pet'rs 56.1 ¶ 12.)  At his deposition, Cerillo testified that passengers used the galley to store their own food and drinks in a refrigerator and to retrieve hooks, fishing rods, sinkers and toilet paper.  (Resp. 56.1 ¶ 10; Resp. Counter-56.1 ¶¶ 12–13.)  According to Cerillo, the galley area is "simply the forward[-]most area of the cabin behind a partial counter."  (Resp. 56.1 ¶ 9.)  Photographs annexed to Petitioners' papers reflect a counter that stretches halfway across the entrance to the galley area.  (Pet'rs Photographs, annexed as Ex. 8 to Decl. of Matthew M. Gorden ("Gorden Decl.") at 7, Docket Entry No. 26-4.)  The photographs also reflect a rope blocking the open area next to the counter and a paper plate placed over the rope.  (*Id.*)  On the back wall of the galley, near the ceiling, is a dark red sign that reads, "Employees Only" and on the next line, "Keep Out."  (*Id.* at 8.)  Petitioners state that fare-paying passengers were not permitted to enter the area behind the galley counter.  (Pet'rs 56.1 ¶ 13.)  Cerillo disputes that passengers were told the galley was off-limits.  (Resp. Counter-56.1 ¶ 13.)  In fact, Cerillo asserts that, "[i]n over 100 trips on Jeffrey Nagler's fishing boats, neither [Cerillo] nor his son . . . ever saw the string and paper

plate device that appears in the photograph," and the string and paper plate were not present on the date of the incident. (*Id.*; Resp. 56.1 ¶ 11.)

## II. Discussion

### a. Standard of review

Summary judgment is proper in a maritime limitation-of-liability proceeding only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. M.T.A. N.Y.C. Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id*. The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. The Limitation Act

Under the Limitation Act, "the liability of the owner of a vessel for any claim, debt or liability . . . shall not exceed the value of the vessel and pending freight," provided that such liabilities "aris[e] from any . . . act, matter, or thing, loss, damage, or forfeiture, done . . . without

the privity or knowledge of the owner." 46 U.S.C. § 30505(a)–(b). Congress enacted the

Limitation Act "to encourage ship-building and to induce capitalists to invest money in this

branch of industry." *In re Petition of Germain*, 824 F.3d 258, 263 (2d Cir. 2016). The

Limitation Act "creates 'a form of action peculiar to the admiralty and maritime context,'

allowing the owner of a vessel to file a petition in federal court seeking total exoneration or

limitation of liability for 'damages caused by the negligence of his captain or crew.'" *Id.* at 263–

64 (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243–44 (2d Cir.

2014)); *see also* Fed. R. Civ. P. Suppl. Rule F ("Rule F"). Thus, "[i]nstead of being vicariously

liable for the full extent of any [damages] caused by the negligence of the captain or crew

employed to operate the ship, the owner's liability is limited to the value of the ship unless the

owner himself had 'privity or knowledge' of the negligent acts." *Otal Investments Ltd. v. M/V

CLARY*, 673 F.3d 108, 115 (2d Cir. 2012) (quoting *In re City of New York*, 522 F.3d 279, 283

(2d Cir. 2008)).

　　　To assert the right to limit liability, the owner of the vessel must bring a civil action in

federal district court under the Limitation Act within six months of receiving written notice of a

claim. 46 U.S.C. § 30511(a); Rule F(1). The limitation of liability petition must state the facts

on which the right to limitation is asserted, as well as any facts the court would need to consider

in determining the amount of limited liability. Rule F(2). Typically, "once the owner files a

petition for limitation, all other claims and proceedings against the owner related to the matter in

question shall cease." *Id.* at 264 (alterations and internal quotation marks omitted) (quoting

*Tandon*, 752 F.3d at 244); *see also* 46 U.S.C. § 30511(c). The court must then issue notice to all

persons asserting claims that the owner seeks to limit, and those persons may file claims and

challenge the owner's right to limitation or exoneration.[7]  Rule F(4); *Germain*, 824 F.3d at 264.

   Sitting in admiralty, without a jury, the court must conduct a *concursus* proceeding,[8]

during which the court determines whether there was negligence, whether the negligence was

without the privity and knowledge of the owner and, if limitation is granted, how the limitation

fund should be disbursed.  *In re Complaint of Dammers & Vanderheide & Scheepvaart Maats*

*Christina B.V.*, 836 F.2d 750, 755 (2d Cir. 1988).  Specifically, a court sitting in *concursus*

undertakes a two-part analysis.  "First, the court must determine what acts of negligence caused

the accident.  Second, the court must determine whether the ship owner had knowledge or privity

of those same acts of negligence."  *Otal*, 673 F.3d at 115 (alterations and internal quotation

marks omitted) (quoting *In re Moran Towing Corp.* ("*Moran I*"), 166 F. Supp. 2d 773, 775

(E.D.N.Y. 2001)).  The claimant "bears the initial burden of proving negligence," after which the

burden shifts to the ship owner to "prove lack of knowledge or privity."  *Id.* (quoting *Moran I*,

166 F. Supp. 2d at 775).  "The court must determine whether the accident was caused by conduct

that is actionable, for if there was no fault or negligence for the shipowner to be privy to or have

knowledge of within the meaning of the statute, there is no liability to be limited, and the owner

would then be entitled to exoneration."  *In re Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (quoting

---

[7]  The Court issued notice on May 4, 2015, (*see* Notice, Docket Entry No. 14), and Cerillo filed a claim in response to the Petition on June 12, 2015, (*see* Answer, Docket Entry No. 15).

[8]  The term "concursus" derives from the French *concours* and, going further back, from the Latin *concurrere*.  The basic literal meaning is a running or assembling together — a confluence.  In its legal context, a *concursus* is a proceeding to marshal all claims, or bring them into concourse, and settle all disputes in one action in order to efficiently identify each litigant's share of a common fund.  *See* 80 C.J.S. Shipping § 499 (2017); *see also* Frederick W. Swaim, Jr., *Limitation of Liability & Direct Actions: The Relevant Fund*, 7 Loy. Mar. L.J. 247, 248 n.307 (2009).

*The 84-H*, 296 F. 427, 432 (2d Cir. 1923)).  If the petition for limitation of liability is granted,

"the owner can be liable on the covered claims only up to the total value of his vessel and its

pending freight; that amount will then be distributed pro rata among the proven claims."

*Germain*, 824 F.3d at 264 (quoting *Tandon*, 752 F.3d at 244).

Petitioners and Cerillo cross-move for summary judgment based on the other's inability

to meet their burden of proof in the two-step analysis.  That is, Petitioners argue that Cerillo has

not met his burden of proving negligence, and Cerillo argues that Petitioners cannot meet their

burden of proving lack of privity or knowledge.  The Court discusses each prong of the analysis

below.

### i.  Negligence — step-one analysis

Petitioners argue that they are entitled to summary judgment on their Petition as it relates

to the Midnight Star[9] because Cerillo has not "proven by a preponderance of the evidence" that

Petitioners were negligent and that their negligence caused Cerillo's injury.  (Pet'rs Mem. 6–7.)

Petitioners argue that, as a result, the Court need not consider whether Petitioners lacked privity

or knowledge because Cerillo has not met his initial burden of proving negligence.  (*Id.* at 8.)

Cerillo argues that he has pled a claim for negligence and that significant issues of fact regarding

---

[9]  Petitioners also argue that they should be exonerated from liability as to any claims against the Lady Midnight because the parties have stipulated that none of the events leading to Cerillo's injury occurred aboard that vessel.  (Pet'rs Mem. 2; *see* Stip Re Vessel at 1.)  Cerillo does not address this argument in his opposition papers but agrees in the stipulation signed by the parties that all references to the Lady Midnight should be construed as references to the Midnight Star.  (*See* Stip. Re Vessel at 1.)  Because there is no dispute that the incident did not occur aboard the Lady Midnight, the Court grants summary judgment to the extent that the Petition seeks exoneration from liability as to the Lady Midnight.

Petitioners' breach of duty preclude summary judgment in Petitioners' favor.  (Resp. Mem. 9–10.)

At the first step of a limitation-of-liability proceeding, a court determines whether the vessel owner is entitled to limitation by inquiring into whether there were any "acts of negligence or unseaworthiness [that] caused the casualty."[10]  *In re Bridge Constr. Servs. of Fl., Inc.*, 39 F. Supp. 3d 373, 384 (S.D.N.Y. 2014) (quoting *In re Moran Towing Corp.* ("*Moran II*"), 984 F. Supp. 2d 150, 180 (S.D.N.Y. 2013), *vacated in part on other grounds sub nom*, *Moran Towing Corp. v. Young*, 597 F. App'x 33 (2d Cir. 2015)).  Ordinary principles of common law negligence apply to a maritime negligence claim.  *In re Treanor*, 144 F. Supp. 3d 381, 388 (E.D.N.Y. 2015) (citing *Cornfield v. Cornfield*, 156 F. App'x 343, 344 (2d Cir. 2005)); *In re Bridge Constr. Servs.*, 39 F. Supp. 3d at 382 ("In a limitation of liability proceeding, 'the elements to establish a claim of negligence under maritime law are the same as the elements of negligence under common law.'" (citation omitted)).  Thus, a claimant must establish a legal duty, a breach of that duty, causation, and damages.  *Treanor*, 144 F. Supp. 3d at 389; *In re Bridge Constr. Servs.*, 39 F. Supp. 3d at 383 (citing *Cornfield*, 156 F. App'x at 344).  Essentially, "[t]he test is, could the [incident] have been prevented by the exercise of ordinary care, caution and maritime skill?"  *In re Bridge Constr. Servs.*, 39 F. Supp. 3d at 383 (quoting *The Jumna*, 149 F. 171, 173 (2d Cir. 1906)).

Under admiralty law, the owner of a ship in navigable waters owes a duty to its passengers to exercise "reasonable care under the circumstances."  *In re City of New York*, 522 F.3d at 283 (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632

---

[10]  Cerillo does not argue that the Midnight Star was unseaworthy on the day of his injury.  (*See generally* Resp. Mem.)

(1959)); *Grp. Therapy, Inc. v. White*, 280 F. Supp. 2d 21, 37 (W.D.N.Y. 2003), *aff'd in relevant part sub nom. Clementi v. Comm. Union Ins. Co.*, 92 F. App'x 826 (2d Cir. 2004) (quoting same). "Under well-established principles of Second Circuit maritime negligence law, an owner breaches his or her legal duty of reasonable care by failing to take simple precautions to prevent foreseeable and serious injury." *Treanor*, 144 F. Supp. 3d at 389 (citing *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947)); *see also In re City of New York*, 522 F.3d at 284 (holding that petitioner breached its duty of care by failing to abide by minimally burdensome "two-pilot" guideline, which would have prevented serious harm even though likelihood of harm was low (citing *Carroll Towing*, 159 F.2d at 173)); *see generally Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 826 (2d Cir. 1994) ("Reasonable care is determined in light of whether or not a particular danger was foreseeable."). A claimant must also demonstrate that the owner's negligence constituted "a substantial factor in producing" the injury. *Treanor*, 144 F. Supp. 3d at 389 (citing *Bonsignore v. City of New York*, 583 F.2d 635, 637 (2d Cir. 1982)). However, under the comparative fault doctrine in maritime law, the claimant need not establish that the owner's negligence is the sole cause of the injury. *See Otal*, 673 F.3d at 113 (discussing standard for allocation of maritime liability based on fault (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975))).

The law is well settled, and the parties do not dispute, that Petitioners owed Cerillo a duty of reasonable care under the circumstances. *See In re City of New York*, 522 F.3d at 283. In the underlying personal injury action, Cerillo alleges that Petitioners acted negligently in undertaking that duty when, in an area frequented by passengers, they opened and left open the plywood cover of a hatch, approximately twelve square feet in area, which led to a generator beneath the body of the ship. (Compl. ¶¶ 14–15.) Cerillo alleges that he was severely injured as

a result of Petitioners or a member of their crew leaving the hatch open and, later, failing to take corrective action by immediately returning to shore after Cerillo's fall.  (*Id.*)  Based on the evidence before the Court, the parties dispute several issues of fact material to a determination of whether Petitioners breached their duty of reasonable care.

First, the parties dispute whether passengers were permitted to enter the galley area where Cerillo fell.  Cerillo and his son testified that during their hundred-plus trips with Petitioners, they and other passengers frequently went into the galley area to obtain hooks, bait, drinks, food and toilet paper.  (Dep. of Michael Cerillo ("Cerillo Sr. Dep.") 51:9–22, Docket Entry 26-9; Cerillo Jr. Dep. 36:1–10, 40:2–3, 40:17–25.)  Cerillo and his son also testified that the captain and crew of the Midnight Star did not make safety announcements or warnings over the public audio system on the vessel, and passengers were not otherwise told to avoid the galley.  (Cerillo Sr. Dep., 33:10–19; Cerillo Jr. Dep. 39:10–23.)  They further testified that in the five years they had been fishing with Petitioners, there was never a rope or other barrier indicating that the galley was off-limits to passengers, (Cerillo Sr. Dep., 54:2–14; Cerillo Jr. Dep. 36:11–21), notwithstanding Petitioners' photographic depiction of such a rope in the galley area, (Pet'rs Photographs at 7).  Nagler disputes all of these statements, asserting that passengers were "absolutely not" permitted in the galley, that he and the crew gave instructions at the beginning of each trip advising the passengers of where they could traverse on the vessel, and that he had placed "no admittance" signs on both the galley's back wall and the counter.  (Nagler Dep. 37:2–12, 37:17–24, 39:14–23.)

Second, the parties dispute whether Nagler exercised reasonable care in responding to Cerillo's injury.  The parties dispute whether Cerillo's son asked Nagler to return to shore so that his father could receive immediate medical attention.  Cerillo, Jr. testified that after the accident,

while his father sat on a bench "writhing in pain," he asked Nagler to turn back to the dock because "something bad happened" and his father was "in pretty bad shape." (Cerillo Jr. Dep. at 30:16–25.) According to Cerillo, Jr., Nagler told him that the ship would head in to shore after another fishing stop. (*Id.* at 31:1–11.) The parties agree that Coast Guard protocol requires a captain to contact the Coast Guard when a passenger is injured aboard a ship and needs medical attention.[11] (*Id.* at 31:12–25; Nagler Dep. 58:17–23.) Petitioners do not dispute that Nagler did not call the Coast Guard when he realized Cerillo was injured, but Nagler states that it was because Cerillo, Jr. told him that Cerillo was feeling fine despite the fall. (Nagler Dep. 59:6–12.)

The Court "resolve[es] all ambiguities and draw[s] all inferences in favor of the nonmoving party" — here, Cerillo — in deciding Petitioners' motion for summary judgment. *See Pinto*, 221 F.3d at 398. On the record before the Court, the Court finds that a reasonable trier of fact could conclude that the crew or captain of the Midnight Star negligently opened or left open the hatch cover in an area frequented by passengers, causing Cerillo's injuries, and negligently exacerbated those injuries by declining to immediately return to shore for medical attention. Here, where the burden of acting with care is low and the parties acknowledge that external Coast Guard standards of care exist to guide ship owners in cases of injury aboard their vessels, a reasonable trier of fact could determine that Petitioners did not exercise "reasonable care under the circumstances." *See In re City of New York*, 522 F.3d at 283 (quoting *Kermarec*, 358 U.S. at 632); *see also id.* at 284 (holding that petitioner breached its duty of care by failing to abide by minimally burdensome "two-pilot" guideline, which would have prevented serious harm even though likelihood of harm was low (citing *Carroll Towing*, 159 F.2d at 173)).

---

[11] The parties have not provided the Court with the relevant Coast Guard regulations or guidelines.

Petitioners suggest that Cerillo must prove by a preponderance of the evidence that Petitioners acted negligently, or the Court must exonerate or limit their liability. (Pet'rs Mem. 7.) However, because Petitioners have moved for summary judgment on the Petition, Cerillo's burden as to his claim of negligence is to adduce evidence sufficient to convince a reasonable trier of fact that his injury was foreseeable to a competent and experienced captain and crew and could have been avoided with reasonable care. *See Anderson*, 477 U.S. at 252. The Court finds that Cerillo has satisfied that burden here. Accordingly, Petitioners' motion for summary judgment on their limitation-of-liability petition, which is based only on their claim of lack of negligence, is denied.

A ship owner may succeed on summary judgment to limit liability either by demonstrating that no issue of material fact exists as to the claimant's allegation of negligence, or by demonstrating that, even if there is a genuine issue of material fact as to the issue of negligence, no issue of material fact exists as to the ship owner's lack of privity or knowledge of the alleged negligence. *See Otal*, 673 F.3d at 115 (explaining burdens in a limitation-of-liability proceeding). Here, because Cerillo has adduced evidence of negligence and Petitioners have not argued or presented any evidence that Nagler lacked privity and knowledge of the conditions that caused Cerillo's injuries, Petitioners cannot succeed on a summary judgment motion.

### ii. Privity or knowledge — step-two analysis

The Limitation Act limits a ship owner's liability only when the owner is sued "for the acts of the master or crew done without [the owner's] privity or knowledge." *Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.*, 229 F.3d 397, 402 (2d Cir. 2000) (quoting *Am. Car & Foundry Co. v. Brassert*, 289 U.S. 261, 264 (1933)).

15

Cerillo argues that he is entitled to summary judgment on the privity-or-knowledge prong of the analysis because, in addition to presenting evidence that Petitioners were negligent, there is no genuine issue of material fact as to Nagler's privity or knowledge of the conditions that caused Cerillo's injuries.  (Resp. Mem. 12–14.)  Petitioners do not argue that Nagler lacked privity or knowledge of the conditions.  Instead, they argue that because Cerillo cannot prove negligence, "there can be no inquiry into Nagler's privity or knowledge."  (Pet'rs Reply Mem. in Supp. of Pet'rs Mot. ("Pet'rs Reply") 9, Docket Entry No. 27.)

The term "privity or knowledge" is a term of art that connotes "complicity in the fault that caused the accident."  *Messina,* 574 F.3d at 126 (internal quotation marks omitted) (quoting *Blackler v. F. Jacobus Transp. Co.*, 243 F.2d 733, 735 (2d Cir. 1957)).  Privity or knowledge "exist[s] where the owner has actual knowledge, or could have and should have obtained the necessary information by reasonable inquiry or inspection."  *Mediterranean Shipping*, 229 F.3d at 402 (citation omitted).  An owner's defense that he lacked privity or knowledge fails where the owner personally participated in the negligent act, *see 84-H*, 296 F. at 431, or where the owner had actual or constructive knowledge of the dangerous condition, *Otal*, 673 F.3d at 115. *See id.* ("Privity or knowledge can be actual or constructive.  Either way, the term usually implies some degree of culpable participation or neglected duty on the shipowner's part; that, for example, it committed a negligent act . . . or through the exercise of reasonable diligence could have prevented the commission of the act . . . ."); *see also Repub. of France v. French Overseas Corp.*, 277 U.S. 323, 331 (1928) (holding that the failure to exercise due diligence in ascertaining a dangerous condition defeats a claim for exoneration or limitation of liability); *McNeil v. Lehigh Valley R.R. Co.,* 387 F.2d 623, 624 (2d Cir. 1967) ("Negligent failure to discover constitutes privity and knowledge within the meaning of the statute.").  To sustain its burden at a *concursus*,

16

an owner "must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause. If it cannot show how the loss occurred, a [ship owner] must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge."[12] *Moran II*, 984 F. Supp. 2d at 180 (internal quotation marks omitted) (quoting *Terracciano v. McAlinden Constr. Co.*, 485 F.2d 304, 307–08 (2d Cir. 1973)).

The judicial trend "has been to expand the scope of activities that fall within the privity of the owner, including imputing to corporations knowledge or privity of lower-level employees." *Moran II*, 984 F. Supp. 2d at 180 (quoting *Matter of Oil Spill by Amoco Cadiz off the Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992)). For example, if an injury occurs as a result of a ship owner's failure to use "due and proper care to provide a competent crew," that negligence is necessarily "within the owner's privity." *Messina*, 574 F.3d at 127. Similarly, "the failure of a ship's master to exercise diligence in selecting, training or supervising crew members whose [acts or omissions] contribute to an accident is proper ground to deny limitation of liability." *Potomaco Transp., Inc. v. Ogden Marine, Inc.*, 909 F.2d 42, 46 (2d Cir. 1990); *see also Messina*, 574 F.3d at 127 ("When an owner entrusts the operation of his vessel to an inexperienced person, he destroys any argument he might have had for limitation of his liability."); *Guglielmo*, 897 F.2d at 62 ("[I]gnorance of a reason to suspect incompetence is not enough. Moreover, it is not enough for a boat owner to harbor a subjective belief that an

---

[12] This burden would apply at a *concursus*. However, because Cerillo has the burden of production on his cross-motion for summary judgment, to defeat summary judgment Petitioners need only adduce some evidence that they lacked privity or knowledge of the negligent acts — evidence sufficient to demonstrate a genuine issue of fact for determination at a *concursus*. *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (explaining that a non-movant's burden to present a genuine issue of fact arises when the moving party meets its burden of production).

operator is competent.  That belief must be based on evidence of competence that renders the belief objectively reasonable.").

Some Circuit Courts have held, as Cerillo argues, that where an owner is operating his own vessel at the time of the alleged negligent act, he is necessarily charged with privity or knowledge of that act.  *See Joyce v. Joyce*, 975 F.2d 379, 385 (7th Cir. 1992); *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1563–64 (11th Cir. 1985); *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977).  Although this rule is not stated in the text of the Limitation Act, it stems from the reasoning that "when an owner is in control of and operating his pleasure craft he has privity or knowledge with respect to its operation, therefore he is not entitled to limitation for accidents arising from his negligence."  *Fecht v. Makowski*, 406 F.2d 721, 722 (5th Cir. 1969).  Numerous courts have followed this logical premise.  *See, e.g.*, *In re Archer*, 20 F. Supp. 3d 1166, 1170 (D. Colo. 2014); *In re Martin*, 18 F. Supp. 2d 126, 128–29 (D. Mass. 1998); *In re Cirigliano*, 708 F. Supp. 101, 104 (D.N.J. 1989); *Complaint of Ingoglia*, 723 F. Supp. 512, 515 (C.D. Cal. 1989).

In the Second Circuit, however, "the mere presence on board of an owner does not constitute such privity as will preclude limitation of the owner's liability."  *Messina*, 574 F.3d at 127 (internal quotation marks omitted) (quoting *Complaint of Interstate Towing Co.*, 717 F.2d 752, 754 (2d Cir. 1983)).  Nevertheless, if the owner, "by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty, the right to limitation is properly denied."  *Id.* (internal quotation marks omitted) (quoting *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1158 (2d Cir. 1978)).  Thus, "[i]n the case of individual owners, it has been commonly held or declared that privity as used in the statute means some personal participation of the owner in the fault or

negligence which caused or contributed to the loss or injury." *Id.* at 126 (quoting *Coryell v. Phipps*, 317 U.S. 406, 411 (1943)). "Where the owner's negligent act caused the alleged injury . . . all of the requirements of 'privity' are satisfied." *Id.* (quoting *Tug Ocean Prince*, 584 F.2d at 1159).

Construing the facts in Petitioners' favor on Cerillo's cross-motion, the Court finds that, as Cerillo argues, no reasonable trier of fact would conclude that Nagler lacked privity or knowledge of the alleged negligence. By his own admission, Nagler personally participated in each allegedly negligent act. Nagler admitted that he typically opened the hatch in the mornings to check the generator and that he did so on the morning of September 15, 2014. (*See* Nagler Dep. 42:22–44:15.) He also testified that on the day of the accident, the hatch was open, mid-trip, to cool the generator because it had been running for hours that morning. (*Id.* at 70:5–12.) Because the generator did not often overheat, there was not often reason to open the hatch in the middle of the day. (*Id.* at 71:8–16.) Nagler did not recall whether he had opened the hatch himself that afternoon but said that, typically, he "would notify the crew to do it." (*Id.* at 71:2–3.) He further testified that a mate would only open the hatch at his direction. (*Id.* at 72:3–6.) This is consistent with testimony from Cerillo, Jr. that shortly after the accident, Kyle White, a mate aboard the ship that day, told him that Nagler had opened the hatch in the morning. (Cerillo Jr. Dep. 35:2–10.) White then told Cerillo, Jr. that the mates were not permitted to close the hatch unless Nagler specifically directed that they do so.[13] (*Id.* at 35:11–25.) In addition, Nagler admitted that he did not comply with Coast Guard requirements to report injuries and did not immediately return the vessel to shore because he did not understand the extent of Cerillo's injuries. (*Id.* at 59:6–9, 61:4–12.) Based on these facts, Nagler either opened the hatch himself

---

[13] Petitioners do not challenge the admissibility of this evidence.

or directed it to be opened, and admittedly had knowledge of the injured passenger aboard his vessel when he decided not to return to shore.  Consequently, there is no genuine issue of material fact as to his privity and knowledge of the alleged acts of negligence, and he is not entitled to exoneration or limitation of liability.

Where, as here, the only remaining issue is a ship owner's liability for negligence, there is no issue bearing on the Limitation Act to warrant a *concursus*.  *See, e.g.*, *Joyce*, 975 F.2d at 385 (dismissing petition where owner had privity or knowledge because owner was either beyond protection of the Limitation Act or would not be found negligent and would have no need for its protection); *Fecht*, 406 F.2d at 722–23 (stating that "where no grant of limitation is possible, the basis for granting exoneration vanishes"); *see also Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 453 (2001) (explaining that the proceeding is called "exoneration from or limitation of liability" because the Limitation Act does not require a ship owner to concede liability in order to file a petition); *Colonial Sand & Stone Co., Inc. v. Muscelli*, 151 F.2d 884, 885 (2d Cir. 1945) ("The right to limitation of liability is quite separate from the validity of the underlying negligence claim.").  Because the only remaining issues of dispute are whether Nagler and his crew acted negligently in opening and leaving open the hatch door and failing to immediately notify the Coast Guard and return the ship to shore after Cerillo's injury, the Court cannot provide recourse under the Limitation Act.  Explained differently, if Nagler is found to have acted negligently, he is not protected by the Limitation Act because he has not — and cannot — satisfy his burden of proving a lack of privity or knowledge.  If Nagler is not found to have acted negligently, he will incur no liability and therefore have no need for the Limitation Act.  Because there is no scenario in which the Petition could be granted, the Court denies

Petitioners' motion for summary judgment, grants Cerillo's cross-motion for summary judgment and dismisses the Petition.

### c. Jurisdiction over the underlying personal injury claim

Cerillo requests that the Court remand the underlying personal injury action to New York Supreme Court, Kings County, citing his right to proceed in state court and have his common-law claims tried by a jury. (Resp. Mem. 5, 8.) Petitioners argue that they have properly removed the personal injury action to federal court because it arises from an alleged maritime tort and falls under the Court's admiralty and maritime jurisdiction. (Reply Mem. in Further Supp. of Pet'rs Mot. ("Pet'rs Reply Mem.") 5, Docket Entry No. 27.) Petitioners reason that because federal courts have original jurisdiction over claims sounding in admiralty, the Court has removal jurisdiction pursuant to 28 U.S.C. § 1441.[14] (Pet'rs Mem. 4–5.)

Cerillo appears to rely on the second clause of 28 U.S.C. § 1333(1), which provides federal district courts with original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, *saving to suitors in all cases all other remedies to which they are otherwise entitled*." 28 U.S.C. § 1333(1) (emphasis added). Although Cerillo's argument on this point is slightly unclear, he appears to argue that this latter clause, referred to as the "savings to suitors" clause, preserves his ability to litigate his common-law negligence claim in state court even where it would otherwise fall within a federal court's original jurisdiction. (Resp. Mem. 5, 8.) The Court understands Cerillo to contend that removal of his negligence claim from state court undermines the "saving to suitors" clause, particularly if the Petition is dismissed. The Court agrees.

---

[14] Pursuant to 28 U.S.C. § 1441, "[a] defendant may remove an action originally filed in state court to federal court if the case originally could have been filed in federal court." *Vera v. Saks & Co.*, 335 F.3d 109, 113 (2d Cir. 2003) (citing 28 U.S.C. § 1441(a)).

Before Congress enacted the First Judiciary Act, the predecessor to section 1333, some common-law remedies in admiralty cases were administered by state courts. *Nassau Cty. Bridge Auth. v. Olsen*, 130 F. Supp. 3d 753, 759 (E.D.N.Y. 2015) ("[S]ome remedies in matters maritime had been traditionally administered by common-law courts of the original States." (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 362 (1959))). Even after the First Judiciary Act granted federal courts original jurisdiction over admiralty cases, the Supreme Court interpreted the "saving to suitors" clause to preserve the historical role of state courts in administering common-law remedies, such as jury trial, in admiralty cases. *See Dammers*, 836 F.2d at 755 ("The savings clause has long been recognized as meaning that in cases of concurrent jurisdiction in admiralty and common law, the jurisdiction in the latter is not taken away. The saving is for the benefit of suitors, plaintiff and defendant, when the plaintiff in a case of concurrent jurisdiction chooses to sue in the common law courts . . . ." (quoting *Waring v. Clarke*, 46 U.S. 441, 460 (1847))); *N.J. Steam Nav. Co. v. Merch.'s Bank of Boston*, 47 U.S. 344, 390 (1848) ("The saving clause was inserted probably from abundant caution lest the exclusive terms in which the power is conferred on the district courts might be deemed to have taken away the concurrent remedy which had before existed."); *In re Henry Marine Serv., Inc.*, 136 F. Supp. 3d 401, 412 (E.D.N.Y. 2015) (explaining the significance of the saving-to-suitors clause).

Ordinarily, the "saving to suitors" clause conflicts with the Limitation Act because:

> the 'savings to suitors' clause gives claimants the right to a choice of remedies, while the . . . Act gives vessel owners the right to seek limitation of liability in federal court. Therefore, by exercising its equitable powers in claims for limited liability, the federal district court necessarily denies the claimants their right to pursue common law claims before a jury in state court.

22

*In re Leigh*, No. 13-CV-294, 2014 WL 1315394, at \*4 (E.D.N.Y. Mar. 31, 2014) (internal

quotation marks omitted) (quoting *In re Longshore Sailing Sch. Inc.*, 09-CV-1176, 2010 WL

326210, at \*2 (D. Conn. Jan. 19, 2010)); *see also Dammers*, 836 F.2d at 755 ("In exercising this

equitable power, of course, the admiralty court must necessarily deny the claimants their right to

pursue common law claims before a jury. . . . Such a result is in direct conflict with the promise

of 28 U.S.C. § 1333 that the exercise of admiralty jurisdiction will not deny suitors their right to

common law remedies.").

Because section 1441, the removal statute, would exacerbate this tension by allowing

defendants to remove to federal court admiralty cases brought under the "saving to suitors"

clause, the Supreme Court and the Second Circuit have interpreted section 1441 to permit

removal of common-law admiralty claims only where there is a separate basis for federal

jurisdiction. For example, in *Romero*, the plaintiff was a Spanish citizen injured while working

on a boat owned by a Spanish corporation. *Romero*, 358 U.S. at 358. The plaintiff brought suit

in federal court, and the district court dismissed his claim for lack of subject-matter jurisdiction

because the parties were not diverse and an *in personam* admiralty claim did not, by itself,

present a federal question. *See id.* Thus, the question on appeal in *Romero* was whether

admiralty cases "arise under" federal law for purposes of 28 U.S.C. § 1331 and present a federal

question. The Supreme Court held that admiralty cases do not present a federal question. *See id.*

at 379–80. In so holding, the Court noted that making admiralty cases freely removable would

undermine the "saving to suitors" clause: "Thus the historic option of a maritime suitor pursuing

a common-law remedy to select his forum, state or federal, would be taken away by an expanded

view of § 1331, since saving-clause actions would then be freely removable under § 1441 of

Title 28." *Id.* at 371–72. To reconcile this conflict between the "saving to suitors" clause and

the removal statute, the Court held that admiralty cases were only removable if the admiralty

case had an independent basis for subject-matter jurisdiction, such as federal question or

diversity of citizenship.  *Id.*

Relying on *Romero*, the Second Circuit in *Pierpoint v. Barnes*, 94 F.3d 814 (2d Cir.

1996) suggested in *dicta* that the admiralty cases at issue were not removable without diversity

jurisdiction because to remove them otherwise would undermine the "saving to suitors" clause:

> Admiralty excepts a class of cases from the general rule that cases
> which could originally have been filed in federal court are
> removable to federal court at the option of the defendant. Common
> law maritime cases filed in state court are not removable to federal
> court, due to 28 U.S.C. § 1333's "saving to suitors" clause.  Dating
> back to the Judiciary Act of 1789, this clause preserves a plaintiff's
> right to a state court forum in cases arising under the common law
> of the sea.

*Pierpoint*, 94 F.3d at 816.  Courts in this Circuit have often relied on *Pierpoint* to remand

admiralty cases where they were removed to benefit a ship owner who filed a related limitation-

of-liability petition in federal court.  *See, e.g.*, *Nassau Cty. Bridge Auth.*, 130 F. Supp. 3d at 763

(remanding case to state court because "the [p]laintiff's claim, although sounding in admiralty, is

not removable under § 1441, without an independent basis of federal jurisdiction"); *Speranza v.

Leonard*, 925 F. Supp. 2d 266, 269–70 (D. Conn. 2013) (remanding case to state court for lack of

jurisdiction because it involved four state-law maritime claims and one claim under the Death on

the High Seas Act); *Port Auth. of N.Y. & N.J. v. Am. Stevedoring, Inc.*, No. 10-CV-99, 2010 WL

979733, at *1 (E.D.N.Y. Mar. 16, 2010) ("[A] defendant may not remove a maritime action

seeking a state law remedy even if the plaintiff could have brought the action in federal court on

the basis of admiralty jurisdiction."); *see also Oklahoma ex rel. Edmondson v. Magnola Marine

Transp. Co.*, 359 F.3d 1237, 1241 (10th Cir. 2004) ("'[C]ourts have consistently interpreted the

'savings clause' to preclude removal of maritime actions brought in state court and invoking a

state law remedy, providing there is no independent basis for removal' such as the presence of a

federal question or diversity of citizenship." (quoting *In re Chimenti*, 79 F.3d 534, 537 (6th Cir.

1996))); *McAllister Bros v. Ocean Marine Indem. Co.*, 742 F. Supp. 70, 76–77 (S.D.N.Y. 1989)

(concluding that the action was properly removed, despite the general rule against removal of

admiralty claims, because the plaintiffs had mistakenly filed the action in state court and

requested removal, invoking the court's admiralty jurisdiction).

       Here, the Complaint in Cerillo's underlying negligence action does not provide an

independent basis for removal, and Cerillo requests in his papers that the Court remand the

negligence action to New York State Supreme Court, Kings County. (*See* Resp. Mem. 5, 8.)

There is no diversity of citizenship because both parties are citizens of New York. (S*ee* Compl.

¶¶ 1–3.) Likewise, there is no federal question because the only cause of action is for common-

law negligence. (*See id.* ¶¶ 16–28.) "If at any time before final judgment it appears that the

district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c);

*see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter

jurisdiction, the court must dismiss the action."); *Pierpoint*, 94 F.3d at 816. The Court has

determined that it lacks subject-matter jurisdiction over Cerillo's negligence claim in 15-CV-

1557 and therefore remands that case to New York State Supreme Court, Kings County.

### III. Conclusion

For the foregoing reasons, the Court grants Petitioners' motion for summary judgment as to the Lady Midnight and denies Petitioners' motion as to the Midnight Star. The Court grants Cerillo's cross-motion for summary judgment and dismisses the Petition to the extent that it seeks to limit liability to the value of the Midnight Star and her freight. In addition, the Court remands *Cerillo v. Nagler*, 15-CV-1557, to New York State Supreme Court, Kings County.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  March 23, 2017
    Brooklyn, New York